The next case is Warner Chilcott v. Lupin & Amneal, 2014-1262-1273. Mr. Green, you're ready. Good morning, Your Honors. I am here on behalf of the Lupin appellants. The case before this honorable panel is really an issue of simple obviousness, although the trial below certainly did not reflect that fact. In sum, the position taken by the defendants in the case was that a 984 patent was invalid, invalid for obviousness, and in particular, obviousness over the 940 patent. It's an interesting file history that's provided in this case, perhaps more on point than you find in many. If you look at the procedural background in this case, you'll find that the examiner below rejected many, many times the claims that were pending over a very similar patent, the 490 patent. The 490 patent, in fact, was filed by two of the same inventors as with respect to the 940 patent. It was filed by Shearing, a reputable pharmaceutical company, as acknowledged by the testimony of Dr. Darney, one of the plaintiffs' experts below. The background clearly shows that the 984 patent claims were directed to a 24-4 regimen, 24 days of a combination pill that included a progestin and an estrogen, and then four days that had both a placebo interval and two days of unopposed estrogen. Clearly there was a lot of close prior art here, but the district judge did a very careful job of analyzing the references and discussing the witnesses? Certainly the judge wrote an extensive opinion. The error, and I do believe that this is an error that's substantial and one that presents an interesting issue to this panel, hinges on why the 940 patent wasn't really convincing prior art to the court. And it's very, very troubling, I believe, if you look at the opinion issued by the court, for example, at appendix pages 823, 825, where in addressing the 940 patent, the district court in particular found, for example, when referring to the plaintiff, the defendant's expert, Dr. Barnhart, that he did not point to any commercially successful product or any product for that matter that resulted from the 940 patent. But that's only a very small point in a very extensive opinion. Your Honor, I would respectfully disagree with that because it goes much deeper. He goes on to find that the 940 patent contains no data that demonstrates the efficacy or cycle control of any of the many regimens of the 940 patent. And finally, he concludes that in the light of the absence of data in the 940 patent regarding the efficacy or cycle control of a 15-microgram regimen, a PULSA would not necessarily have been led to make an oral contraceptive combining 15 micrograms of EE with 1 milligram of NA. But isn't the reference effective for what it says, even if it doesn't have data proving the truth of what it says? Indeed it is, Your Honor, and that's the reason why the treatment of the 940 patent by the district court was clearly in error. The district court discounted, if it considered at all, the teachings of the 940 patent because it couldn't find a commercial product, and it couldn't find data in the patent. So then it moved on to disregard the explicit teachings in the 940 patent of the same regimen that is a 24-day interval at the beginning of combined progestin and estrogen, followed by four days where there's a placebo interval, and two days of an estrogen. The only difference being between the placebo interval in the claims of the 984 patent is it came at the end of those four days. The 940 chose to put it in between the combination pills and the two unopposed estrogen pills. That truly is the only difference. But the trial then that we had before the district court dealt with what I would say are issues that really should have never been dealt with. Because the judge explicitly set aside the explicit teachings of the 940 patent, then the trial really devolved into an issue of, I'd say, irrelevancies. For example, the question of whether to choose a 24-4 regimen in the first instance. The 940 patent teaches a 24-4 regimen. I think also telling on this point is the 490 patent, which, similar to the 940 patent, also had 24 days of combination pills, followed by four subsequent days. What significance, if any, do you attach to the difference in the progestin that's used in the 984 and the 940? They use two different progestins. What significance do you attach to that? The 940 patent did specifically teach, it lists eight progestins, and it specifically teaches the use of NE or norethindrone. That is a teaching in the 940 patent. That is a claim, three claims actually, of the 984 patent encompass the use of progestin, which is norethindrone. Indeed, norethindrone and norethindrone acetate are discussed within the 984 patent as though they're interchangeable. The specific claims get to norethindrone acetate. Norethindrone acetate and norethindrone are known to have very similar activities in the body because norethindrone acetate is simply the acetate ester of norethindrone. The art cited below clearly states, and no one argues with this, that norethindrone acetate does convert readily in the body to norethindrone. This is a very interesting question to also take in the context of the prosecution file. I'm somewhat disturbed by your prior statement that the trial court simply glossed over 940 and didn't consider it in any specificity. I thought they had my foot back. And there is considerable discussion in the opinion. I apologize if it came across as though the court didn't consider it. It did consider it, but it disregarded what the 940 patent taught because of the very reasons that it found there was no commercial embodiment and there was no data and consequently discounted what a person of ordinary skill in the art would do with the 940 patent, which is contrary to, I believe, any precedent. The 940 expressly attributes benefits to its order of administration, right? Indeed, indeed. In fact, that is what we envisioned was going to be the main issue before the court initially. And as I indicated, it turned out that we ended up spending a bunch of time not dealing with that. The question of the position of the placebo, I believe, is a serious question to be dealt with and one which was dealt with by the defendants, I think, quite thoroughly. There is motivation to make a change, moving the placebo period from that shown in the 940 patent, which is between the combination pills and the unopposed estrogen, to the location that's claimed in the 984, the last two days of that 28-day cycle. And what is that? The 940, and this is not disputed either, and Dr. Darney agreed with it, but the 940 patent said the reason why it's in that location is it reduces amenorrhea. Amenorrhea is an instance where a woman simply does not experience a normal menstrual period. And the issue as to whether the patent then would teach flipping it to then cause amenorrhea to increase was dealt with by Dr. Darney in his testimony we cited in the brief is quite clear. He said, right, if you were to flip the position of the placebo pill and the unopposed estrogen pills, in fact, you would increase amenorrhea. So the only fact dispute that came out of this was was at the time of the patenting of the 984 patent a desired effect to have from an oral contraceptive from the standpoint of a woman. And Dr. Darney initially testified that it would not have been a desired side effect. In fact, it would have been a side effect which would have not been desired. But if you look at the cross-examination which followed, which substantially went after the publication by Dr. Darney, which is at Appendix 1144, in 2005, which is the relevant time frame for the analysis of the obviousness of the 984 patent, Dr. Darney then clearly indicates, and I should say the 490 patent was filed in 94 and the 940 patent, the priority document is in 95. In 2005, Dr. Darney reports in the Clinical Guide to Contraception, more and more women are embracing the idea that fewer menstrual periods provide a welcome relief from bleeding and menstrual symptoms. Many women do not require the periodic experience of vaginal bleeding to assure themselves that they are not pregnant. Modern society is long past the notion that menstrual bleeding is a cleansing event for detoxification. Foregoing bleeding is an individual woman's choice. And he agreed that he wrote that. And as of 2005, what does that establish? It establishes clearly that there had been a change from 1994 and 1995 to 2005 in the mindset of women, and that he testified that many women, in fact, as of 2005, would desire, as an attribute of taking the oral contraception pills, the amenorrhea. And that motivation to change then, which was found not to exist by the district court, is refuted by the plaintiff's own expert witness. I see that I'm in the rebuttal time, so if you have any further questions at this time, I'd like to take them. Thank you. We will save the rest of your time. Mr. Green, Mr. Pappas. Good morning, Your Honor. Judge Pisano, in our opinion, wrote a thorough opinion, and he weighed all of the facts. And most importantly, he weighed all of the evidence. And in some cases, he made credibility findings, particularly— There is a lot of very close prior art, and it's almost just a simple reversal of the second two periods. Your Honor, I— Among the references. Sure. Turning to that, I think the biggest complaint we have or disagreement with Lupin's argument is that it focuses on one piece of prior art, but it does not do what the court has repeatedly reminded counsel they must do. And that is, in considering an obviousness question, you consider all of the prior art. All of it. Lupin has ignored most of it. So let's examine all of that art, Judge Lurie, in terms of the totality of the art. And what does it teach? Well, as Judge Pisano found, there would be no combining of one milligram of norethindrome with less than 20 micrograms of ethinostradiol. It was beyond capital in the art, all of the art, that was induced in this trial, that if you go below 20 micrograms of ethinostradiol, you will get follicular growth, which can cause unintended pregnancy, and you'll get bad cycle control. Both to be avoided, if at all possible. Indeed, what we proved in the record is since the 1973 pill of low estrin, 120, one milligram of norethindrome acetate and 20 micrograms of ethinostradiol, it had efficacy problems, unintended pregnancies, bad cycle control, and in 30 years after that, no oral contraceptive approved in the United States of America was made with one milligram of norethindrome acetate and 20 micrograms. Indeed, to the extent in the 20 years after 1973, all of the oral contraceptives used 30 micrograms. Why? Because it was beyond capital among skilled artisans, that if you go to 20 with one milligram of norethindrome acetate, you will have an unacceptable pill. What do I mean by acceptable? Unintended pregnancies and bad cycle control, which will lead the women to not take the pill, they get pregnant, and then we have all the moral and religious issues that go along with that. Even after 20 years, there were additional oral contraceptives introduced in this country. Most of them were 30. A couple went to 25, and a couple went to 20. But you know what they used? Gestadine, levonorgestrel, norgestamine. Second and third generations norgestamine. Ergo, I get to my second teaching that it's beyond capital. Norgestamine, northindrome acetate, is a weak progestin. It's well recognized as a weak progestin. And the stronger progestins are preferred now because they have longer half-life, which makes it more forgiving in case the woman forgets to take the pill on time. And it's more potent, which means it primes the progestin receptors to improve cycle control and again to lessen the chance of pregnancy. Now, that's the second teaching, which is, if you even want to consider going below 20 micrograms of estrogen, you must use a more powerful progestin. Case in point, Evidence. Menace, the only pill in the world that had 15 micrograms in Europe, not in the United States, used Gestadine. And do you know what Frizzetti and Brianchi, the two prior art scholars, wrote? The reason it was able to go to 15 micrograms is because of the more powerful progestin. No evidence to the contrary by Lupin. None whatsoever. So as we stand here today, there is only one oral contraceptive in the world that uses one microgram of northindrome acetate and dares to go below 20. Indeed, all the way down to 10. And it's low, low estrogen. So that's what the totality of the prior art is. Now let me turn to the pill flip. Again, the prior art in its totality supports us, not Lupin. Lupin would trivialize the invention by saying, obvious to flip the placebo and the unopposed estrogen. Where is that teaching in the art? Only in Lupin's mind. The 940 patent, and I'll read this quote because I think it's dispositive, this is what they teach the skilled artisans. Their order, which is to give the unopposed estrogen right before the combination pill. They said, ensures withdrawal bleeding, which contrary to what Mr. Green said, is preferred by most women. Why do they want to withdraw bleed? It's similar to menses. You take the pill because you don't want to get pregnant. Having that withdrawal bleed is comfort and assurance to the woman that she's not pregnant. Can some woman put up with amenorrhea? Yes, but it's not preferred. And the court made a factual finding there that's correct, not only is it not clearly erroneous, it was correct, that most women don't. But they also say in the 940 that their order of the pills produces in the subsequent administration cycle a reduced rate of intracyclic menstrual bleeding compared with conventional low dose. So, 940 teaches the POSA. Put the placebo first, put the unopposed estrogen right before the combination pills, and you'll get two very desirable characteristics. The woman will have her withdrawal bleed, and it will improve cycle control, and therefore compliance. Let's search the rest of the prior art. 843 patent teaches exactly the same thing. 490 patent has the identical quote I just read to you. And there is a product called Mercet, approved in the United States. It's a 20 microgram pill. It does it the way the 940 patent does it. So, let's weigh. 940 patent says put the unopposed estrogen before the combined pill. Mercet says do it. 843 patent says do it that way. 490 patent says do it that way. Over here. Put the unopposed estrogen first and the placebo next, like the 984 does it. Zero. None. Nothing. No prior art. Simply put, that equals no motivation to do it and no expectation of success. And moreover, why would you do it? 940 teaches put the unopposed estrogen right before the combined and you'll get better cycle control. And you'll give that woman the withdrawal bleach most women, not all, need and want. Where's the motivation to reject that teaching? When there's two other United States patents and a successful product that does it just like that. And there is no suggestion, not in any articles or patents, that says flip the pills. So, some of your questions. The judge did a very careful review of the 940 patent. Mr. Green would have you just look at the pill switch. No. He found that the 940 patent didn't disclose norethindrone acetate. And his own expert said norethindrone acetate and norethindrone are different. And Dr. Barnhart, his expert, wrote articles talking about the differences. There was no suggestion you could use one milligram of norethindrone acetate. There was also no suggestion or teaching in the 940. And remember, these are regimens, gentlemen. This isn't a composition. These are regimens with six variables. There is no suggestion in the 940 that you can use one milligram of one of the weakest progestins known to science with a 10 milligram or microgram or 15 microgram dosage. No. Mr. Pettis. Yes. I'm not going to tell you how to argue your case, but I'm going to ask your opposing counsel about not having mentioned secondary considerations. I was just going to get that. Okay. Because as I read in Recyclobenzadrine, you all have made it clear that this is now a holistic analysis, that the court should consider motivation to combine reasonable expectation, success, and objective indicia if it's before in making the decision in its entirety. Let's talk about that. Perhaps the most amazing one, I think, is unexpected results. Based on everything I've told you and the record we produced, there was no expectation by any POSA that Loloestrin would work. Indeed, the testimony of Dr. Darney, who is without a doubt one of the leading experts in the world, and Dr. Kagan, the leading clinician, when they heard about Loloestrin, she laughed. Dr. Darney said it will never work. Dr. Darney said it will never be approved. Even today, there are many doctors who cannot explain and don't understand and are surprised that it works. Indeed, it's the only 10-milligram microgram estrogen pill in the world. The results could not have been more unexpected. Second, the PERL index, which measures unwanted pregnancies, was found by a statistician in the FDA to be acceptable and not to be statistically different than Loloestrin 24 higher dose. Unsurprising. Unexpected. And the FDA found that the cycle control in Loloestrin was comparable to other products with more estrogen. All of those are unexpected results. But what could be more unexpected or surprising, which is what your cases capture, than the leading experts, let alone the persons of ordinary skill in the arts. The leading experts say, we didn't think it would work when it came out. We're still befuddled, surprised, shocked that it does. These are eminent physicians. Which leads me now to long felt need and why this is so important. And commercial success only in the sense that 3 million prescriptions were written in the first 24 months. By learned intermediaries. Doctors don't prescribe pills that don't work or aren't good for the women. Dr. Kagan gave unrebutted and the judge accepted her testimony. It met the need for thousands. We know 3 million. A woman who cannot abide large doses of estrogen. They simply can't. They throw up, they get breast tenderness, headaches, which unfortunately lead to noncompliance. Dr. Kagan said, this pill does something that no other oral contraceptive does. It satisfies the need for, in the first 23 months, 3 million women whose bodies simply cannot tolerate substantial doses of estrogen. So, Lolo Estrin does that. So you have unexpected results, long felt need, and a meaningful form of commercial success. I'm not standing here before arguing that 3 million is a lot or a little number. The question I think that's probative for this court is, why? With 30 plus pills on the market, crowded market, why were 3 million prescriptions written in the first 24 months? And the answer is quite frankly, simple. It's because there are women out there who cannot tolerate large amounts of estrogen. You have to know estrogen is important because it retards follicular growth. So you have surprise pregnancies. And it supports the endometrium so you don't have breakthrough bleeding. So for all those reasons, and I must conclude by this point, because I think it really is critical. We have trials for a reason. We have a learned judge who listened for 8 days to testimony. He made findings of fact, and under your case law, under Rule 52, unless those are clearly erroneous, and unless his decision on obviousness is clearly erroneous, they should be affirmed. And lest there be any doubt, it is Lupin's burden to prove these facts by clear and convincing evidence. And they did not meet that burden. And the judge made, in each and every case, this court has said, here are the questions of fact, motivation to do it, reasonable expectation of success, what a reference teaches, whether a reference teaches a way, and objective edition of non-obviousness. You all have said repeatedly, those are questions of fact. Judge Pisano made questions of fact on every one of those. I understand that Lupin wishes the outcome would have been different. But the only way they even make the argument they do today is by cherry-picking one reference and then in all candor, not even focusing on what that reference in its totality taught. So unless there are any further questions, Your Honor, I see mine in 38 seconds, but I will finish early. If nothing, no one loses by surrendering extra time. Thank you, Your Honor. Mr. Pappas, thank you. Mr. Green has some rebuttal time. Let me start first with the unexpected results issue. All of the claims in the 984 patent have a range of EE of 5 to 15. Dr. Darney, in cross-examination, was asked whether he knew if a 5-microgram EE embodiment, otherwise similar to the commercial product low-low estrin, would work. He said he didn't know. It's clear that to have unexpected results or any type of secondary considerations considered, the claim scope must be commensurate with the showing. It is not Dr. Darney's testimony that is quite telling on that. How about the specific claims? All claims are 5 to 15. There is no limit. In fact, 15 is preferred in the 984 patent. The blocking patent issue was raised. I won't go into the detail. We've briefed it. It was ignored by the lower court. The key to the issue of commercial success is cannibalization. The unrebutted testimony was that once low-low estrin was approved, Werner Chilcott polled all of the marketing effort for low estrin. If you look at the chart in our brief, it shows, almost on a unit-by-unit basis, all of the low-estrin sales were transferred over to low-low estrin. Sure, it was successful because it cannibalized the low-estrin product, which they withdrew essentially from the market at that time. With respect to the benefits issue, their expert testified that the expert could not determine a distinction between the benefits of the 398 patent, which we haven't talked about. Physicians would not be prescribing unless they felt there was an additional benefit. Once the detailing stops, Your Honor, I mean we're dealing with the commercial environments. The detailing stopped. They substituted and promoted the low-low estrin product in view of low estrin. Do they think it's going to have a benefit? It's marketed as new out of the market. What I can say is it's really not disputed, but that there was a total cannibalization so that on a unit-by-unit basis, all of the low-estrin sales went to low-low estrin. And the records replete with the testimony that there was a switch in the marketing that took place at that time. With respect to unexpected results, there's no comparison with the 940 patent whatsoever. The Pearl Index issue, the lowest Pearl Index ever was achieved, which is bad, not good, for the low-low estrin product that was noted in the reviewer's approval papers. The testimony by the expert that there was no statistically significant difference indeed was in the record that the fact that there is no statistically significant difference only means just that. There was no difference in the statistics. What it didn't show was whether the product, in fact, was the same. No conclusion can be reached as to the similarity between the low estrin and the low-low estrin product in the absence of some amount of statistical significance. I think that's basic statistics law. With respect to progestin potency, the testimony by Dr. Darney I think is quite clear. And if you look at appendix page 1091, he specifically said that the potency of a drug does not determine its efficacy or safety, only the amount of drug required to achieve an effect. There is no clinical evidence that a particular progestin is better or worse in terms of a particular side effect or clinical response. The oral contraceptives should be judged by their clinical characteristics, efficacy, side effects, and so forth. Essentially saying, if it's less potent, you use more. With respect to the amount of N.A. used, every approved product as of the critical date in the U.S. that used norepinephrine acetate used one milligram. We have that in the brief. The prior art suggested points to that. Mr. Green, your red light is on, so we'll close the argument and take the case under advisement. Thank you, Judge.